**SACK & SACK, ESQS.**
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                  :
**JENNIFER FEINERMAN**,                           :        1:08-CV-03517
                                                  :
                                                  :        ECF CASE
                               Plaintiff,         :
                                                  :
          — against —                             :        <u>**COMPLAINT**</u>
                                                  :
**T-MOBILE USA,** and **DAVID LAMPKIN,**          :
individually**,**                                 :
                                                  :        **JURY TRIAL REQUESTED**
                               Defendants.        :
                                                  :
                                                  :
                                                  :
------------------------------------------------------------------------x

     Plaintiff, Jennifer Feinerman (*"Feinerman"* or *"Plaintiff"*) by her attorneys, Sack &

Sack, Esqs., file the following Complaint against her former employer  Defendant T-Mobile USA

(*"T-Mobile"*) and immediate supervisor and David Lampkin (*"Lampkin,"* together with T-

Mobile*, "Defendants"*).

     Ms. Feinerman, as and for her complaint, alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff complains that her former employer, T-Mobile, engaged in the unlawful discrimination and subsequent retaliation of Plaintiff in the terms, conditions, and privileges of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, ("*Title VII*") based upon her sex, female.

2.      Plaintiff further complains that Defendants engaged in the unlawful discrimination and retaliation of Plaintiff in the terms, conditions, and privileges of her employment in violation of New York State New York State Human Rights Law, Executive Law § 290 et seq. ("*NYSHRL*") and the Administrative Code of the City of New York § 8-101 et seq. ("*NYCHRL*") based upon her sex, female.

3.      Plaintiff files this action to seek monetary relief for the denial of equal employment opportunity and for the unlawful employment practices of Defendants.

4.      Plaintiff further complains that she has suffered, is suffering and will continue to suffer severe economic and non-economic damages because Defendants deprived Plaintiff of her employment rights in violation of federal and state law.

5.      On or about September 11, 2007, Plaintiff filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("*EEOC*"), which bore charge number 520-2007-04403.

6.      Plaintiff timely brings this action within ninety (90) days of the receipt of a Notice of Right to Sue Letter ("*NORTS Letter*"), issued by the EEOC on January 15, 2008.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

8.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a).  Venue in this matter is properly laid in the District because the violations of the Plaintiff's federal and state civil rights occurred during the course of their employment at branch office locations in this District, because the Defendant does business in this District, and because most of the fact witnesses and evidence are common to or most convenient to this District.

9.      Plaintiff served copies of this Complaint upon the New York City Commission on Human Rights and the New York City Corporation Counsel prior to filing it in the United States District Court.

**PARTIES**

10.      Plaintiff is an individual who, at all times relevant to this Complaint, has resided and currently resides at 340 East 74th Street, #3-F, New York, New York 10021, County of New York.

11.      From November 2002 until her unlawful termination on August 24, 2007, Plaintiff was employed by T-Mobile.

12.      At all times relevant herein, Plaintiff was an "employee" within the meaning of 42 U.S.C.A. §§ 2000e, et seq., § 296 of the NYSHRL and under § 8-102(1) of the NYCHRL and

3

thus, afforded protection against sexual harassment and discrimination and retaliation in employment on the basis of her sex, female.

13.     At all times relevant to this Complaint, Defendant is a corporation licensed to do business in the State of New York, with offices located at 665 Broadway, Suite 400, New York, New York  10012, County of New York.

14.     At all times relevant herein, Defendant is an "employer" within the meaning of 42 U.S.C.A. § 2000e-(b), § 292 of the NYSHRL and under § 8-102(5) of the NYCHRL.

15.     Defendant Lampkin is an individual who is currently employed at Defendant T-Mobile.

16.     At all relevant times herein, Defendant Lampkin was Plaintiff's supervisor and in a position to discriminate and retaliate against Plaintiff in violation of NYSHRL and NYCHRL.

17.     At all relevant times herein, Defendant Lampkin is an individual who either aids, abets, incites, compels or coerces unlawful discriminatory retaliation pursuant to NYSHRL and NYCHRL.

<u>FACTS COMMON TO ALL COUNTS</u>[1]

The claims set forth herein arise from the following set of facts:

| INTRODUCTION |
| --- |

18.    Ms. Feinerman is a married mother of two children, Molly (2 years old) and Jacob (17 months old), and Ms. Feinerman is protected under the Federal, State and City discrimination statutes protecting employees.

19.    Ms. Feinerman is a talented and experienced sales executive, and has worked for T-Mobile since November 2002.

20.    Ms. Feinerman charges T-Mobile with unlawful discrimination based on her gender, female, as specifically set forth herein.

| HIRING − SALES ROLE − DUTIES |
| --- |

21.    In or about November 2002, Ms. Feinerman began her employment as Regional Director of New York for General Business on behalf of T-Mobile.

22.    This position, which Ms. Feinerman held from her hire in November 2002 through her unlawful termination on August 24, 2007, is a sales position, where Ms. Feinerman was responsible for recruiting, hiring, training, managing and motivating all employees consisting of 6 sales managers and roughly 43 sales representatives.

23.    In addition to ensuring that all employees maintained monthly sales quotas, Ms. Feinerman was also responsible for controlling the Region's overall cost ("*CPGA*") as well as

---

1. All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

maintain legacy and new customer base for New York and New Jersey to ensure churn remained under company standards.

24.    Ms. Feinerman was hired by Victor Neeley, T-Mobile's National Director and his supervisor Michael Cote, Vice President of Sales at T-Mobile.

25.    The sales territory (or region) that Ms. Feinerman was responsible for covering consisted of New York City, Brooklyn, Queens, Long Island 1 and Long Island 2.

26.    When Ms. Feinerman commenced her employment, her region was considered an "underperforming" region.

**ACCOMPLISHMENTS – FLAWLESS PERFORMANCE**

27.    From the commencement of her employment, up until and continuing through the date of her termination, as a direct result of her hard-work, savvy business acumen, expert communication, team building and sales skills and in-depth knowledge of T-Mobile's sales business, Ms. Feinerman significantly implemented, developed, built and maintained T-Mobile's sales business within her region, improving overall financial performance and increasing T-Mobile's profits and exceeding revenues year-over-year.

28.    For example, at the time of her hire, her region was doing approximately 400 SIMs sales per month, and as of the date of her unlawful termination on August 24, 2007, was doing approximately 2,700 SIMS sales per month..

29.    Ms. Feinerman was able to increase SIMs sales through better alignment of the territories to match the T Mobile footprint since T Mobile had stronger coverage in New York City.  Ms. Feinerman closed the outer borough offices and added 3 teams within New York City.

Also, during this time, Ms. Feinerman recruited and trained more talented management staff as well as sales professionals.

30.    Ms. Feinerman also worked very close with T-Mobile's internal training department and helped them develop the entry level sales training (7 steps of the sales) still utilized today for every new hire. Ms. Feinerman, along with Tim Neilan, another Regional Director at T-Mobile. facilitated this training in Las Vegas, Nevada  in 2003.  The training included how to prospect, sell, manage your territory and funnel management.  Ms. Feinerman also worked with the training department on a program to better assist the managers when running their day-to-day business.  These programs consisted of how to run a meeting, training and career pathing.

31.    In addition to new managers, Ms. Feinerman assisted her management staff in hiring the best entry level sales people that would be long term successful employees with T-Mobile.  Many of the employees are still with T-Mobile till today.

32.    Because her region was and is within the tri-state area, her position required little to no overnight travel to accomplish and exceed sales quotas.

33.    Any traveling that was required of Ms. Feinerman was for training purposes and was limited to maximum of 2-3 trips per year lasting 2-3 business days.

34.    In respect of traveling, from November 2002 through approximately the first quarter of 2005, Ms. Feinerman did not miss one off-site meeting requiring travel.

35.    In 2004 Ms. Feinerman was awarded the Peak Achievement Award (a one week paid trip to Hawaii) for her accomplishments in 2003.  This is one of the most elite and honorable awards for a sales employee at T-Mobile to be awarded.

36.    In respect of each year of her employment, Ms. Feinerman consistently met and exceeded her sales quotas.  Furthermore, until Ms. Feinerman began having children and raising a family, Ms. Feinerman never received any criticisms or poor performance evaluations of any sort in respect of her sales performance or management skills.

37.    Year-over-year, Ms. Feinerman's compensation, which is a combination of base salary and commissionable sales, increased significantly as follows:

| YEAR | ANNUAL COMPENSATION |
|------|---------------------|
| 2003 | $168,901 |
| 2004 | $229,363 |
| 2005 | $242,555 |
| 2006 | $266,606 |

**MOLLY IS BORN – MS. FEINERMAN DILIGENTLY CONTINUES TO PERFORM HER ASSIGNED DUTIES**

38.    Even during and following the birth of her children, Ms. Feinerman was considered one of T-Mobile's most successful Regional Directors, not only meeting but exceed her sales quotas and requirements.

39.    Ms. Feinerman's first child, Molly, was born on May 24, 2005.

40.    As a testament to her dedication and desire to perform in the best interests of her employer, T-Mobile, Ms. Feinerman worked literally up until the day Molly was born.

41.    Not surprisingly, even when Ms. Feinerman was admitted into the hospital and during labor, Ms. Feinerman continued to respond to emails from her team as well as customers.

42.     Even following Molly's birth, Ms. Feinerman continued her commitment of providing stellar service and dedication to T-Mobile by not taking a maternity leave.

| REORGANIZATION |
| --- |

43.     In or about August 2005, T-Mobile underwent a structural reorganization where the two (2) business channels formerly known as General Business and National and Strategic accounts became one team now referred to as Business Sales.

44.     As a result of the reorganization, many redundant and low-performing Regional Directors and other sales people were terminated.

45.     Despite the layoffs, in respect of her continued hard-work, savvy business acumen, expert sales skills and in-depth knowledge of T-Mobile's sales business, Ms. Feinerman was not only retained by T-Mobile to continue in her duties, but T-Mobile expanded her sales duties to cover regions previously covered by now-terminated Regional Directors.

46.     As a result of the reorganization, MS. Feinerman's supervisor, Neeley, left his position and Ms. Feinerman began to report to Jim Robertiello, Divisional Director of the East Coast Regions.

47.     Furthermore, at that time, Michael Cote's VP position also became vacant until Ian Mackay was assigned as acting VP.

48.     Later that year, in 4th Quarter 2005, Mackay officially became Vice President of Sales.  Ms. Feinerman was not considered for this promotion.

49.     Prior to Robertiello and Mackay taking over as her supervisors, they were not familiar with her savvy business acumen, expert sales skills and in-depth knowledge of T-Mobile's sales business – but Ms. Feinerman did not disappoint.

50.     During the time Ms. Feinerman reported to Robertiello, Ms. Feinerman won several monthly awards for having the lowest churn, highest sales productivity per sales rep on the East Coast, and highest % over quota.

51.     These many awards that Ms. Feinerman received were usually in the form of a gift certificate from giftcerticate.com.

52.     In sum, even after the reorganization and the expansion of her region, Ms. Feinerman's sales performance continued to exceed those of her peers and her sales team that Ms. Feinerman managed, consisting of at least 43 sales reps and 6 managers, also continued to perform at top levels allowing her region to exceed in sales beyond T-Mobile's expectations and quotas.

## IMPOSITION OF TRAINING SEMINARS

53.     Shortly after the reorganization, with new management in place, new (and onerous) obligations were placed upon Ms. Feinerman that had nothing to do with her abilities to successfully perform the duties and functions of a Regional Director whose responsibilities were, and did in fact accomplish, meeting and consistently exceeding sales quotas, thereby increasing revenues and profits on behalf of T-Mobile.

54.     Specifically, from the beginning of the first quarter of 2006, T-Mobile began scheduling at least 10 "Sharing Best Practices" and "Leadership Summits" per year, each lasting three to five days long, located outside of her region.

55.     The scheduling of these "Sharing Best Practices" and "Leadership Summits" (or "*Training Seminars*") have nothing to do with Ms. Feinerman's abilities to perform the sales

duties and functions of her position as Regional Director and meet company expectations, but make it difficult for any mother of small children to attend.

56.     During Ms. Feinerman's employment with T-Mobile, traveling was never an essential function of her job duties and goals, since her sales territory was within driving distance of her home.

57.     It was only after Ms. Feinerman returned from maternity leave with her first baby, did T-Mobile first communicate that Ms. Feinerman would be required to travel.

58.     Ms. Feinerman's repeated requests for reasonable accommodations and her offers of compromise to attend these Training Seminars on a modified schedule that would allow her to attend pertinent portions of the Seminar while being able to care for her family was met with resistance, hostility and retaliation.

59.     In early 2006, Mackay scheduled one such Training Seminar for Directors and managers in Scottsdale, Arizona that was scheduled to last approximately 4 days.

60.     In order to attend the trip, Ms. Feinerman informed Robertiello that Ms. Feinerman was looking to secure child care so that she may attend.

61.     Ms. Feinerman further informed him that since 9/11, Ms. Feinerman was afraid to fly but did so for the benefit of T-Mobile.

62.     Robertiello responded by saying, **"it will get easier the more and more you do it."**

63.     Ms. Feinerman was surprised by Robertiello's response, especially since other employees, similarly situated to myself and who do not fly due to fear of flying or other medical

or psychological conditions are exempt from attending these Training Seminars without any repercussions or retaliation.

64.     As her husband's occupation requires him to leave as early as 6:00 am and come home as late as 8:15 pm, Ms. Feinerman needed to secure additional child care for her daughter in order to take the trip.

65.     Since her caregiver has a child of her own, Ms. Feinerman asked her mother, who resides in Delray Beach, Florida to take a few days off of work to assist her so Ms. Feinerman can attend the trip to Scottsdale.

66.     On February 3, 2006, at her expense, her mother flew into New York City so that Ms. Feinerman may attend the Training Seminar in Scottsdale, Arizona.

67.     Though Ms. Feinerman was packed and ready to go, on Monday, February 6, 2006, the night before the trip, Ms. Feinerman woke up in the middle of the night with a terrible stomach virus.

68.     Ms. Feinerman took medication hoping to relieve the pain, and when she could not, Ms. Feinerman emailed Robertiello at approximately 3:27 am explained to him that Ms. Feinerman was ill and that Ms. Feinerman would not be able to attend the Training Seminar.

69.     Ms. Feinerman never received a reply back from Robertiello.

70.     In or about late March – early April 2006, a few weeks following the Scottsdale Training Seminar, Ms. Feinerman spoke with Mackay regarding the recent increase in frequency in Training Seminars and the increase in the duration of each Training Seminar and the hardship these seminars impose upon caregivers, especially since those seminars have little or no relation to her ability to generate significant revenues on behalf of T-Mobile.

71.     Ms. Feinerman explained to MacKay that as a result of the long duration of these Training Seminars, it would be difficult for her to attend each of the 10+ seminars spanning 3 – 5 days each, located outside of her region.

72.     At that time, Ms. Feinerman also explained to MacKay that for the first three (3) years her employment the frequency and importance of these Training Seminars were much less.

73.     In response, MacKay assured Ms. Feinerman that he would be willing to work something out where someone from her region can "stand in" for her so that the information from the trip can be reported back to her and her sales region.

74.     At that time, Ms. Feinerman also informed MacKay that she was pregnant with her second child.

75.     Rather than express congratulatory sentiments, MacKay asked Ms. Feinerman if she can get a new nanny to care for her child – one that will be able to stay over when Ms. Feinerman traveled.

76.     Ms. Feinerman was shocked and offended by MacKay's overture on how to care for her children; an overture he would not have made had Ms. Feinerman been a man.

77.     Ms. Feinerman explained to him that her position as Regional Director of Sales for one of the busiest regions of T-Mobile required her to work long hours away from home and that to find, train and trust a new nanny that her daughter feels comfortable with is not efficient nor practicable for either myself, her daughter or T-Mobile.  Ms. Feinerman told MacKay that, **"our family trusts our nanny and it is extremely hard to find a good reliable person to care for children."**

78. Ms. Feinerman further explained to MacKay that the Training Seminars were always on the West coast, to which he responded, **"We are a West coast company."**

79. This was the last conversation Ms. Feinerman had with MacKay regarding this topic.

80. During the months of April 2006 – October 2006, despite the difficulties of traveling several times per year for several days each time just to attend Training Seminars, especially while pregnant, Ms. Feinerman attended several Training Seminars that included a meeting in Orlando and a meeting in Chicago.

81. The Training Seminar Ms. Feinerman attended in Orlando is known as WES (Wireless Enterprise Symposium hosted every year by RIM/Blackberry), which MacKay requires all Regional Directors to attend.

82. The Training Seminar Ms. Feinerman attended in Chicago was a sales and service summit run by Sue Nokes, who is Senior VP of Sales and Customer Service and MacKay's boss. This seminar lasted 2 business days.

83. It is important to note that none of these meetings were considered MacKay's "quarterly meetings."

84. For both of these trips, Ms. Feinerman's mother flew into New York City in order to take care of her daughter.

**JACOB IS BORN**
**MS. FEINERMAN DILIGENTLY CONTINUES TO PERFORM HER DUTIES**

85.    On October 23, 2006, Ms. Feinerman gave birth to her son Jacob.

86.    As a testament to her dedication and desire to perform in the best interests of her employer, T-Mobile, Ms. Feinerman worked literally up until the day she gave birth to Jacob.

87.    Not surprisingly, even when Ms. Feinerman was admitted into the hospital during labor, Ms. Feinerman continued to respond to emails from her team as well as customers.

88.    Even following Jacob's birth, Ms. Feinerman continued her commitment of providing stellar service and dedication to T-Mobile by not immediately taking a maternity leave.

**T-MOBILE ESCALATES ITS DISCRIMINATION AGAINST MS. FEINERMAN**

89.    Immediately following Jacob's birth, T-Mobile continued to discriminate against Ms. Feinerman on the basis of her gender as it increased its efforts to make it more difficult for Ms. Feinerman to do her job and accomplish her duties.

90.    In late November – early December 2006, shortly following Jacob's birth, T-Mobile conducted an evaluation of their leadership (Director and above) or a "3x3."

91.    In a 3x3, a team of T-Mobile employees usually consisting of Ms. Feinerman's supervisor, as well as other executives who may or may not personally know Ms. Feinerman, answer the 3x3 form and evaluate core competencies of leadership to decide where Ms. Feinerman fit on the grid.

15

92.    On November 16, 2006, Robertiello called Ms. Feinerman to discuss her evaluation.

93.    At that time, Robertiello informed Ms. Feinerman that as a result of her not traveling as frequently as requested by T-Mobile due to the caring of her children, Ms. Feinerman was rated "to the left of the vital core" (which means that Ms. Feinerman was purportedly *less* vital) because her "peers" who evaluated her did not know her.

94.    Ms. Feinerman was disappointed and frustrated that "peers" who did not know her and know nothing about her dedication, leadership and sales skills were making a determination about her vitality to T-Mobile.

95.    Robertiello, who does know Ms. Feinerman and was familiar with her work ethic and capabilities, admitted to Ms. Feinerman that he considered her to be a vital part of T-Mobile's sales force and convinced those who evaluated her that Ms. Feinerman was vital core.

96.    Robertiello, however, did warn Ms. Feinerman that she "needs to be more visible (i.e., travel) in the future."

97.    At that time Ms. Feinerman asked Robertiello for the specific feedback of her review in writing.  Ms. Feinerman has yet to receive that feedback.

98.    In early December 2006, when Jacob was approximately six (6) weeks old, Robertiello oddly and suddenly urged Ms. Feinerman to take Maternity leave.

99.    At that time, he used several reasons why as it was good for Ms. Feinerman and her children that she take maternity leave, and told her it would create opportunities for her sales people to take a temporary leadership role.

100.    On December 14, 2006, at Robertiello's insistence, Ms. Feinerman scheduled her maternity leave for December 15, 2006.  Upon hearing of the scheduled date for her leave of

absence, Robertiello urged her to change the date to early December 2006 since there were two Training Seminars that MacKay and Nokes expected her to attend even though her son was not even 6 weeks old.

101.    Specifically, on December 4, 2006, Robertiello emailed Ms. Feinerman saying, **"Is it possible to make it effective 12/11?  Since you won't be technically on leave until the 15th, it will be difficult to explain why you aren't at Sue's meeting, which is the 12th-14th."**

102.    Ms. Feinerman responded that, **"I am sure I can but I was trying to do the right thing and wrap up some lose ends like final interviews and account issues like CC.  I am not sure why Ian [MacKay] and Sue [Nokes] would not understand since I am going out on LOA a day later."**

103.    Within minutes Robertiello responded by email, **"They would view it as you are still in work and should be attending the meeting."**

104.    Disappointed by Robertiello's response, Ms. Feinerman emailed him saying, **"I can call HR and change the date.  NP.  To be candid, Ian will still frown upon me not being there regardless of the fact I have a 5 week old baby.  I have been working extremely hard as a sign of my loyalty and commitment to TMO and her team. I feel that this is unrecognized."**

105.    Robertiello admitted that **"I don't think your hard work has gone unrecognized…at least not by me"**; however, he did confirm that T-Mobile was not

17

concerned with her reasons for requesting an accommodation on the traveling requirement, saying, **"The perception you are unwilling to travel by your peers and others (perception = irrespective of circumstances)."**

106.    Robertiello then mentioned that, **"The need for you to allow someone an opportunity to step into your shoes as a career-development move, without you micro-managing the business, so you can take a real leave (i.e., no email). This is "Leaders Coach and Develop Leaders" (in which you have done a good job at the SM level, with promotions, etc.).  We now need to develop and identify your successor.  Right now NY is one area where I don't see a ready succession candidate.  However, I'm willing to help you work on that."**

107.    Ms. Feinerman completely disagreed with Robertiello's comments and informed him that **"I understand what you are saying yet Ms. Feinerman do not agree with the micro-management piece.  My being involved in the day to day is only a sign of dedication and commitment to my position (team, company etc). I choose to be on email because of my dedication not because of micromanagement.  Also, I would be happy to be open to your help and suggestions in all areas mentioned on our 3x3 call.  I was waiting for you to provide a written summary.  If you can also provide some examples on some of the feedback given that would be helpful as well.  I did appreciate your candidness on our call.  Some of the remarks made by others were quite**

18

**harsh.  It would be helpful to get an example from you so I can look to improve."**

108.    Accordingly, pursuant to Robertiello's insistence, from December 11, 2006 through March 2, 2007, Ms. Feinerman took maternity leave to care for her newborn child.

**LAMPKIN ASSUMES POSITION OF DIVISIONAL DIRECTOR**

109.    In or about March 2007, Robertiello took a different position within T-Mobile and was replaced by David Lampkin, the acting Divisional Director.

110.    Despite her recent return from maternity leave and her numerous requests for an accommodation with respect to attending Training Seminars at 3-5 days duration with two (2) small children at home that has little or nothing to do with her ability to perform the functions of her job and meet company expectations, Ms. Feinerman made every effort to attend the Training Seminars, imposing upon friends and family members to do so.

111.    After Ms. Feinerman returned from maternity leave with her second baby her travel requirements more onerous.

112.    Prior to Ms. Feinerman's return from her second maternity leave, it was never communicated to her that she would be required to spend a significant portion of her work time traveling.

113.    Ms. Feinerman was never provided with a job description that contained a "travel requirement."

114.    In or about early May 2007, a Training Seminar was scheduled to take place in Orlando, Florida.

19

115.    In respect of the Orlando trip, Ms. Feinerman's mother watched her two infant children.

116.    Following the Orlando, Florida Training Seminar, Ms. Feinerman was informed by Lampkin that MacKay felt that even though Ms. Feinerman attended the Training Seminar, he claims that he did not see her enough (i.e., "face time") and that Ms. Feinerman had little exposure.

117.    Lampkin was referring to the fact that while the men Regional Directors partied through the night at the Training Seminar, attending strip clubs and bars at T-Mobile's expense, Ms. Feinerman returned to her hotel room at 11pm.

118.    The purpose of the Orlando meeting was to bring customers down to introduce them to new technologies through RIM as well as have the customer (if they would like to) have the opportunity to have an executive meeting with MacKay and the team.

119.    During this trip, the few customers from Ms. Feinerman's region that did attend did not want or need an executive meeting.  Instead, Ms. Feinerman met her sales representative and his customer from Johnson & Johnson for a 2 hour lunch where they discussed business and built relations.

120.    After her meeting later that day, Ms. Feinerman saw MacKay at a company sponsored event who asked her, **"What did you do today?"**  Ms. Feinerman told him, **"I had a great meeting with Johnson & Johnson."**

121.    MacKay did not immediately respond to her report on her sales activities.

122.    On May 11, 2007, shortly after the Orlando trip, MacKay sent the following email to his direct reports, which Ms. Feinerman received:

> **Gents,**
>
> Lampkin and Delano wanted clarity to her message regarding the interaction with the customers and employees.  My message is this:
>
> When we host an event where our top employees and customers are present, I expect the RDs to be visible and present to both the employees and customers – particularly after the meetings when relationships are formed.   Most directors were very active – but I did have a couple tell me that they "caught up on sleep".  Another told me that they didn't have any meetings.  I am also looking to see if the RDs are mingling with a diverse group of employees and using the opportunity to engage themselves in their business.  Bottom line – "Front and Center" management.  I brought this up because I would like you to make sure that your RDs are visible during the upcoming Austin meeting – I would like to see everyone engaged.
>
> It was a great event and everyone did well, but a little coaching to some of the RDs in this area will help them be viewed by their peers and employees as a leader both on and off the court.   We only get together a few times a year – the RDs can catch up on sleep the other 358 days a year.  Call me if you would like some additional clarification.

123.    In addition to the offensive use of the word **"Gents"**, which is consistent with the all-boys club mentality that her similarly-situated male coworkers are more readily accessible to attend frequent and lengthy Training Seminars throughout the year, this recent discriminatory requirement of attending out-of-town meetings as a requirement to her New York sales position is implemented for the purpose of discriminating against Ms. Feinerman as a female and mother of young children.   Regardless of the intent, the effect upon Ms. Feinerman is the same; additional, onerous and non-business related responsibilities to squeeze her out of her career at T-Mobile.

21

124.    On or about June 13, 2007, yet another leadership summit meeting was scheduled to take place in Boston, Massachusetts.

125.    Despite the difficulty for Ms. Feinerman to attend this meeting within weeks of the Orlando meeting, Ms. Feinerman once again solicited family and friends to watch her children so that she may attend.

126.    Up until the time Ms. Feinerman had her first child, T-Mobile never required that Ms. Feinerman attend more than 2 or 3 out-of-state meetings per year, each of which lasted 2 – 3 days.

127.    However, since the birth of her children, T-Mobile has required her to attend several (at least 10) out-of-state meetings that last 3 – 5 days at a time, which have little to no impact on her ability to expend hard-work, savvy business acumen, expert sales skills and in-depth knowledge of T-Mobile's sales to improve T-Mobile's overall financial performance and increase T-Mobile's profits year-over-year.  Had Ms. Feinerman been a man, these onerous and unnecessary restrictions would not be imposed upon her and she would have no need for an accommodation.

128.    On June 13 - 14, 2007, Ms. Feinerman fully participated in the leadership summit in Boston, Massachusetts, while her parents flew into watch her children.

### T-MOBILE CONTINUES TO DISCRIMINATE AGAINST MS. FEINERMAN

129.    Following the Boston meeting, Ms. Feinerman decided once again to speak with her supervisors concerning the onerous impact the frequent scheduling of trips has had on her ability to care for her family as well as effectively manage her sales team, considering that when

Ms. Feinerman was in Orlando, Scottsdale or Boston, she was not in her region assisting her sales team with increasing business.

130.    On June 20, 2007, Ms. Feinerman met with Lampkin to discuss another scheduled Training Seminar scheduled to take place in July 2007 in Austin, Texas and to request an accommodation not to attend that meeting.

131.    The Austin, Texas meeting was scheduled to last five (5) days.

132.    At that time, Ms. Feinerman explained to Lampkin that since Ms. Feinerman had returned from maternity leave in March 2007, Ms. Feinerman had traveled at least once per month and that Ms. Feinerman could not possibly attend another five (5) day training seminar in Austin, Texas.

133.    Ms. Feinerman offered Lampkin her own reasonable accommodation, requesting that Ms. Feinerman be permitted to attend two out of the five days and that Ms. Feinerman would do her best to attend as many meeting as possible in that two-day period.

134.    Rather than take Ms. Feinerman up on her offer and grant her a reasonable accommodation, Lampkin asked Ms. Feinerman to consider looking at other positions within T-Mobile.  Had Ms. Feinerman been a man, Lampkin would not have made this request of a top-producing, diligent, experienced and tenured salesperson.

135.    Ms. Feinerman was disappointed in Lampkin's response and realized that it was easier for him to find another male Regional Director who did not have to bear or care for any small children that would restrict travel (which, once again, has nothing to do with the fact that Ms. Feinerman have consistently exceeded her sales quotas year-over-year) than to provide Ms. Feinerman with a reasonable accommodation.

23

136.   Ms. Feinerman never refused to travel, only that she be accommodated to alleviate the onerous travel schedule.

137.   Ms. Feinerman responded to Lampkin that she was not interested in leaving her current position.

138.   Ms. Feinerman then again asked Lampkin for some flexibility since Ms. Feinerman was doing her best to travel and had already attended two meetings since returning back from maternity leave.

139.   In response, Lampkin agreed that he would talk to MacKay regarding her request, but to no avail.

140.   In or about late June 2007, just one (1) week following their meeting, Ms. Feinerman had a follow-up call with Lampkin at which time there was no mention of travel flexibility.

141.   Instead, at that time, Lampkin simply asked Ms. Feinerman if she had reconsidered attending the Austin, Texas seminar.

142.   Ms. Feinerman once again explained to Lampkin that she had small children and that frequent travel was difficult, especially since her sales region since 2002 was the New York local region.   At the end of the conversation, Ms. Feinerman asked Lampkin to reconsider providing her with a reasonable accommodation to care for her small children and exempt (or even ease) her attendance at out-of-town seminars.

143.    In response, Lampkin sent Ms. Feinerman the following email in retaliation of her request:

> Jenn, I wanted to follow-up on our conversation we had when I was in NY last month regarding travel.
>
> Per our discussion, we require our Regional Directors for Business Sales to participate in leadership/sales meetings and company functions throughout the year. Most of these events require travel outside of your local market. In the past, you have been unable to attend many of these events, due to personal circumstances. However, based on the nature of your role this will continue to be an ongoing requirement of your position.
>
> This recently came up again when you were asked to participate in the Sales Mid-Year Review Meeting in Austin, Texas last week. Based on your history of not being able to travel, I presented you with three options to consider:
>
> 1)  Continue in your role as a RD, but commit to attend all meetings moving forward (including the Austin meeting).
> 2)  Seek another role/position within TMO that doesn't require overnight travel.
> 3)  Find another opportunity outside of TMO.
>
> You had about a week to think about these options before you and I spoke again. At that time, you decided that you could not participate in the Austin meeting due to personal circumstances. You also decided that you couldn't commit fully to option #1 above. In addition, you didn't express an interest in pursuing option #2 - given that most other positions at the Director / Sr. Manager level require travel as well.
>
> I want to be clear, it is our desire to have you stay in your current role and commit to the requirements of your position. However, I understand that if it isn't possible for you to do so, then you'll need to pursue other options as described above.
>
> Please set up a time for you and me to discuss further.
>
> Thanks,
> David

144.    Ms. Feinerman was shocked by Lampkin's ultimatum that she accept the new onerous requirements (which were and are not relevant to her position as a New York Sales

Regional Director) of frequently traveling across the Untied States to attend Training Seminars

or, be terminated from her position at T-Mobile.

145.    Accordingly, on July 20, 2007, Ms. Feinerman sent Lampkin the following

response by email:

> Dear David,
>
> I write in reply to your email from July 18th.  I have enjoyed my 5 years of productive employment at T Mobile.  Throughout that time, I consistently demonstrated my loyalty, dedication to excellence and success through my career.  Indeed, I have devoted a fair amount of my life to this job which effort I am proud of.  Upon employment with TMO, my RD position required little to no travel.  The new fangled requirement that my RD position require more travel outside of my local market will interfere with my obligations to my 2 infant children ages 2 and 8 months.  Remarkably, other similarly situated male co workers are not required to travel.  **It is apparent that your requirement and ultimatum is intended to force me out of a career which I truly love.  You know that I am well suited for this position and I have no desire to seek another type of position within T Mobile.**  Furthermore, I am doubtful an appropriate position exists but I would be willing to explore any opportunity you suggest so that I may continue to add value as a team player for T Mobile.
>
> I have no desire to leave this job and work elsewhere.  To the extent I can't commit to travel, I will make every effort to plan accordingly in advance.
>
> I am hopeful you can be flexible and not arbitrarily require me to make trips and subject me to additional conditions of employment.
>
> I am looking forward to speaking about this further.  Please let me know if Tuesday morning works for you.
>
> Regards,
> Jennifer

## T-MOBILE TERMINATES MS. FEINERMAN'S EMPLOYMENT IN RETALIATION OF HER REQUEST FOR REASONABLE ACCOMMODATION

146.     On July 24, 2007, in response to Ms. Feinerman's email to Lampkin, Sandy Frye, Director of HR for T-Mobile, called Ms. Feinerman to discuss certain language in her email, specifically with respect to "similarly situated males."

147.     When Ms. Feinerman informed her that one such individual was Keith Gould, Frye stated that Keith was a manager and that Ms. Feinerman was a director.

148.     Frye's response made little sense since both managers and directors are considered leaders in T-Mobile's organization.

149.     Furthermore, Keith, who is a Sales Manager in Philadelphia, has been employed by T-Mobile for several years and has never attended one trip even though he along with all other sales managers receive mandatory invites to attend trips/meetings.

150.     Keith's excuse not to attend mandatory meetings and trips outside his region is that he has a fear of travel / medical issue.

151.     In fact, Keith does not get in a car or take trains when there are meetings in Boston. MA.

152.     Furthermore, Keith is on T-Mobile's "do not fly list" – a list that T-Mobile has refused to include Ms. Feinerman on despite her many verbal and written requests for an accommodation.

153.     On July 31, 2007, Ms. Feinerman requested of Lampkin, by email, a time to talk to discuss a business related issue.  Instead, Lampkin unexpectedly called Ms. Feinerman with HR on the line to discuss the travel situation.

27

154.    On this call, Lampkin offered Ms. Feinerman four (4) months of severance pay, essentially informing her of his decision to terminate her employment.

155.    On August 10, 2007, Ms. Feinerman received an invite from Kristi Miller, who is T-Mobile's HR Manager, to attend a conference call with her and Barry Thomas, T-Mobile's Divisional Director for the West Coast.  During this time, she asked Ms. Feinerman to take an administrative leave for 2 weeks (paid) to think about the options presented to her.

156.    Ms. Feinerman responded to Ms. Miller by telling her that she did not need to take any leave of absence and was not disrupting the environment.

157.    Ms. Feinerman then asked that T-Mobile put any request for her to take an administrative leave of absence in writing.  Ms. Feinerman has yet to receive that request.

158.    Since that conference call, Ms. Feinerman continued her regular duties as Regional Sales Director over the New York region until August 13, 2007.

159.    On or about August 13, 2007, Lampkin left voicemail asking Ms. Feinerman to call when she got a minute.

160.    On August 14, 2007, Ms. Feinerman spoke with Lampkin who asked her why she was still working since T-Mobile requested that she take a leave of absence.

161.    Ms. Feinerman informed Lampkin that she needed any request to take a leave of absence to be in writing for her own protection and has yet to receive that request.

162.    About one (1) hour later, Ms. Feinerman received the following email:

> Jenn, you were asked to take a paid administrative leave as of last Monday, August 6th.  Per our discussion this morning, you have yet to comply with our request to take this leave.  Please understand this paid administrative leave begins immediately and should be used to thoroughly review the options T-Mobile has presented to you.
>
> We look forward to discussing this with you on or before 8/24.  In the

meantime, feel free to contact me or Kristi Miller.    Your paid
administrative leave will run through Aug 24th.

Thanks
David

163.    Upon her receipt of Lampkin's August 14, 2007 email, Ms. Feinerman left the
office on administrative leave.

164.    That same day, August 14, 2007, T-Mobile shut down Ms. Feinerman's corporate
email account and she was unable to even initiate an "out of office reply."

165.    At this point, Ms. Feinerman's coworkers, subordinates and customers were
sending Ms. Feinerman emails but are not receiving any response thereby jeopardizing her
credibility.

166.    In addition, Ms. Feinerman's desk and cell phone number was removed from T-
Mobile's directory.

167.    On August 15, 2007, Ms. Feinerman planned to have a meeting at the Long Island
Marriot where more than 45 of her direct reports were planning to attend.  As a result of her
forced and involuntary administrative leave, Ms. Feinerman did not attend.

168.    Ms. Feinerman's counterpart, Gabe Desilva, informed the attendees that Ms.
Feinerman had a "personal issue" and will be "out of the office."

169.    On or about August 24, 2007, subsequent to her being placed on administrative
leave, T-Mobile continued to fail to allow Ms. Feinerman to remain employed with reasonable
accommodations, and, accordingly, terminated her employment.

170.    There is no legitimate business justification for T-Mobile's imposition of onerous
travel requirements as part of her Regional Director sales position in New York.  Had Ms.

Feinerman been a man, she would not have needed an accommodation for the onerous unnecessary requirements imposed by T-Mobile.

171.    During her tenure at T-Mobile, Ms. Feinerman built one of the most successful regions in the country for T-Mobile's business sales.

172.    Ms. Feinerman has always showed a strong level of commitment and dedication to the company and her immediate team.

173.    As of the date of her termination, Ms. Feinerman was over quota at 101.45% to plan for the 2007 year, despite her being on maternity leave for the entire first quarter 2007.

174.    Ms. Feinerman's mid-market productivity at T-Mobile was one of the best in the business channel.  Also, Ms. Feinerman had one of the highest if not the highest rate of internal promotions in the channel as well.

175.    Year over year, Ms. Feinerman had been within the top performers in T-Mobile's Business Sales.

176.    T-Mobile knew that Ms. Feinerman's personal situation (i.e., mother of 2 infant children) made it difficult for her to attend each and every Training Seminar, though Ms. Feinerman did attend most seminars and offered to attend portions of the other seminars.

177.    T-Mobile knows it is easier to hire someone (i.e., a man) that would not require T-Mobile to accommodate and provide the reasonable accommodations Ms. Feinerman required.

178.    Ms. Feinerman was placed on administrative leave, and subsequently terminated from her employment, in retaliation for her request a reasonable accommodation and in discrimination of the terms, privileges and conditions of her employment as a female.

179.    There is no legitimate business justification for such targeting and persecution of Ms. Feinerman to exist at T-Mobile by her supervisor, Lampkin and others.  Such debilitating and discriminatory behavior did not further the business of T-Mobile.

180.    Furthermore, prior to the commencement of this action, Ms. Feinerman served a copy of this Complaint to the following persons at the last known address set forth in accordance with the New York City Administrative Code § 8-502(c):

Corporation Counsel of New York City    NYC Commission on Human Rights
100 Church Street, Room 4313             40 Rector Street, 9th Floor
New York, New York 10007                 New York, New York 10006

**LEGAL CLAIMS**

**AS AND FOR A FIRST CAUSE OF ACTION**

**SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964;**
**42 U.S.C.A. § 2000E**

181.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

182.    Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's sex, female, and show an animus of sex bias.

183.    Defendants' animus towards Plaintiff's sex is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

184.    Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under Title VII.

185.    These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

186.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

187.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

188.    As a proximate result of Defendants' aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

189.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

190.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

191.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses,

benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

192.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

193.    In committing the acts alleged herein, Defendants, jointly and severally,  acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A SECOND CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF GENDER UNDER NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

194.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

195.    Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and show an animus of gender bias.

196.    Defendants' animus towards Plaintiff's gender, female, is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of her terms, conditions, and privileges of employment.

33

197.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

198.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYSHRL § 296(1)(a).

199.    As a proximate result of Defendants' aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

200.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

201.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

202.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

203.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

204.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A THIRD CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF GENDER UNDER
### NEW YORK CITY HUMAN RIGHTS LAW § 8-107

205.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

206.    Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and show an animus of gender bias.

207.    Defendants' animus towards Plaintiff's gender, female, is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

208.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

209.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYCHRL § 8-107.

210.    As a proximate result of Defendants' aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

211.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

212.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

213.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

214.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

215.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A FOURTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964;
### 42 U.S.C.A. § 2000E

216.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

217.    Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

218.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

219.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

220.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

221.    Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

222.    The aforementioned acts of Defendants constitute unlawful retaliation against Plaintiff in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

223.    As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

224.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

225.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

226.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

227.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

228.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR AN FIFTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

229.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

230.    Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under NYSHRL § 296 (1) (a).

231.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

232.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

233.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

234.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

235.    The aforementioned acts of Defendants constitute unlawful retaliation against Plaintiff in violation of the provisions of NYSHRL § 296 (1) (a).

236.    As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

237.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

238.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

239.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

240.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

241.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A SIXTH CAUSE OF ACTION

**RETALIATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW § 8-107**

242.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

243.    Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under NYCHRL § 8-107.

244.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

245.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

246.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

247.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

248.    The aforementioned acts of Defendants constitute unlawful retaliation against Plaintiff in violation of the provisions of NYCHRL § 8-107.

249.    As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

250.   As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

251.   As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

252.   As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

253.   As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

254.   In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### AGAINST LAMPKIN (NYSHRL – AIDING AND ABETTING)

255.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

256.    As a result of the aforementioned actions, Defendant Lampkin has discriminated against Plaintiff on account of her gender with respect to the terms, conditions and privileges of her employment in violation of New York Executive Law § 290 et seq.

257.    As a result of the aforementioned actions, Defendant Lampkin has violated the New York Executive Law §290 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

258.    As a result of Defendant Lampkin's discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### AGAINST LAMPKIN (NYCHRL – AIDING AND ABETTING)

259.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

260.    As a result of the aforementioned actions, Defendant Lampkin has discriminated against Plaintiff on account of her gender with respect to the terms, conditions and privileges of her employment in violation of New York City Administrative Code § 8-101 et seq.

261.   As a result of the aforementioned actions, Defendant Lampkin has violated the New York City Administrative Code § 8-101 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

262.   As a result of Defendant Lampkin's discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## ATTORNEY'S FEES AND COSTS

263.   Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Plaintiff, have in good faith, attempted to negotiate a reasonable resolution with Defendants without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

## PUNITIVE DAMAGES – BAD FAITH

264.   It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.  In light of Defendants' obvious and blatant bad faith, wrongdoing and breach of other duties, ***punitive damages*** should be assessed against Defendants so that they be deterred from attempting such harmful employment practices in the future.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.   An award of Plaintiff's actual damages in respect of loss of wages, promotional opportunities, including an award of front pay compensating Plaintiff for loss of

future salary and benefits had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%;

II.     An award of compensatory damages not less than $3,000,000.00;

III.    An award of punitive damages not less than $3,000,000.00;

IV.    An order enjoining Defendant from engaging in the wrongful practices alleged herein;

V.     An award of prejudgment interest, costs and attorney's fees; and

VI.    Such other and further relief that the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the complaint.


Dated:      New York, New York
            April 1, 2008

                              Respectfully submitted,

                              **SACK & SACK, ESQS.**

                              By:          /s/ *Jonathan Sack*
                                   _____
                                   Jonathan Sack, Esq.  (JSS 1835)

                              **Attorneys for Plaintiff**
                              **JENNIFER FEINERMAN**
                              110 East 59th Street, 19th Floor
                              New York, New York 10022
                              Tel.: (212) 702-9000
                              Fax: (212) 702-9702

                                        45