# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

**JENNIFER FEINERMAN,**

        **Plaintiff,**

        - against -

**T-MOBILE USA and DAVID
LAMPKIN,**

        **Defendants.**

------------------------------------------------------ X

## OPINION AND ORDER

**08 Civ. 3517 (SAS)**

U...
DOCU...
ELECT ... LLY FIL...
DOC #: _____
DATE FILED: 1/28/10

## SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.     INTRODUCTION

        Jennifer Feinerman brings this action against her former employer, T-Mobile USA ("T-Mobile"), and her former supervisor, David Lampkin, in his individual capacity. Feinerman alleges that T-Mobile and Lampkin engaged in employment discrimination on the basis of her gender and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the Administrative Code of the City of New York ("NYCHRL"). Feinerman also alleges that Lampkin aided, abetted, incited, and coerced the alleged discrimination in violation of the NYSHRL and

1

the NYCHRL. Feinerman requests a three million dollar award for compensatory damages, a similar award of punitive damages, attorneys' fees and costs, and an order enjoining the Defendants from discriminating or retaliating against her in the future.[1] T-Mobile now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, T-Mobile's motion is granted.

## II.    BACKGROUND[2]

### A.    Feinerman's Employment with T-Mobile Prior to the Reorganization of T-Mobile's Business Channel

In November 2002, T-Mobile employed Feinerman as a Regional Business Sales Director in the general business sales channel covering New York City.[3] Upon joining T-Mobile, Feinerman signed an agreement that included a provision stating:

> Employees shall perform those duties that employer shall request, which duties may change from time to time at the discretion of employer, as well as those duties normally associated with employee's position of employment,

---

[1]    Feinerman never specifically requests to be reinstated at T-Mobile.

[2]    Except as noted, the following facts are undisputed.

[3]    *See* Rule 56.1 Statement of T-Mobile USA, Inc. ("Def. 56.1") ¶ 1; Plaintiff's Rule 56.1 Statement of Facts in Opposition to Defendant's Motion for Summary Judgment ("Pl. 56.1") ¶ 1.

including teamwork and a commitment to quality, in a professional manner.[4]

In her position as a Regional Business Sales Director, Feinerman oversaw a team of approximately forty-nine sales managers and sale representatives.[5] Feinerman was responsible for ensuring that the business sales managers and their respective sales markets met all their sales, operational, and recruiting objectives.[6] Feinerman was also required to recruit, hire, train, evaluate, and supervise business sales managers.[7]

Between November 2002 and August 2005, Feinerman was occasionally asked to travel in order to attend out-of-town conferences, including some conferences specifically for Regional Directors.[8] Prior to 2005, Feinerman never complained about traveling to the conferences.[9] Feinerman's first child was

---

[4]    Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4; T-Mobile USA, Inc. Restrictive Covenant and Confidentiality Agreement, Ex. 7 to Declaration of Hallie B. Levin, T-Mobile's Counsel ("Levin Decl.").

[5]    *See* Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.

[6]    *See* Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.

[7]    *See id.*

[8]    *See* Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.

[9]    *See* Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.

3

born on May 24, 2005.[10]

## B. Feinerman's Employment with T-Mobile After the Reorganization of T-Mobile's Business Sales Channel

In August 2005, T-Mobile underwent a structural reorganization.[11] T-Mobile merged its general business channel and its national and strategic accounts channel into one channel called business sales.[12] As a result of the reorganization, approximately seven of T-Mobile's approximately eighteen regional directors were terminated.[13] T-Mobile retained Feinerman as one of eleven Regional Directors of the newly formed business sales channel.[14] In this position, Feinerman continued to be responsible for the general business sales in New York and assumed responsibility for New Jersey business sales.[15] She also oversaw a team of approximately forty-nine Senior Sales Managers, Sales Managers, Major

---

[10]    *See* Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7.

[11]    *See* Def. 56.1 ¶ 8; Pl. 56.1 ¶ 8.

[12]    *See id.*

[13]    *See* Def. 56.1 ¶¶ 9, 13; Pl. 56.1 ¶¶ 9, 13; Deposition of James Robertiello, T-Mobile's Division Director of Business Sales ("Robertiello Dep.") at 64:15-20, Ex. 3 to Declaration of Eric R. Stern, Feinerman's Counsel ("Stern Decl.").

[14]    *See* Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10.

[15]    *See* Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14.

4

Account Executives, and Account Executives.[16]

Starting in the first quarter of 2006, and continuing through early 2007, T-Mobile began scheduling an increasing number of out-of-town conferences for Regional Directors.[17] Feinerman estimates that, by 2007, T-Mobile scheduled at least ten out-of-town conferences per year that Regional Directors were expected to attend.[18]

The parties disagree regarding the reasons for the increased number of conferences. According to T-Mobile, Ian Mackay, T-Mobile's Vice President of Business Sales, increased the number of conferences to facilitate "knowledge transfer" among Regional Directors with different areas of expertise and to address "the poor employee morale" and "the tremendous infighting" between Regional Directors from the former general business channel and Regional Directors from the former national and strategic sales channel.[19] T-Mobile also asserts that the conferences provided an opportunity for the Regional Directors to talk about the business at large, including its goals, objectives, and strategies for

---

[16]     *See* Def. 56.1 ¶ 92; Pl. 56.1 ¶ 92.

[17]     *See* Def. 56.1 ¶¶ 15-17; Pl. 56.1 ¶¶ 15-17.

[18]     *See* Def. 56.1 ¶ 16; Pl. 56.1 ¶ 16.

[19]     Deposition of Ian Mackay, Vice President of Business Sales at T-Mobile ("Mackay Dep.") at 30:18-31:21, Ex. 4 to Levin Decl.

the upcoming year; to hear concerns from T-Mobile employees and customers and convey those concerns to corporate leadership; and to convey strategic messages from the corporate leadership back to the field.[20]

According to Feinerman, the primary purpose of the conferences was to socialize with other T-Mobile employees.[21]  Feinerman states that the conferences had little to do with business and T-Mobile employees spent much of the time engaging in non-business activities including fly fishing and skiing.[22] During a typical five-day conference, Feinerman estimates that at least one and sometimes two full days were devoted exclusively to non-business activities.[23] Feinerman also argues that the conferences could not have been important to T-Mobile's business because, in early 2008, many of the conferences were cancelled due to financial considerations.[24]

The parties also disagree about Feinerman's attendance record at the

---

[20]     *See id.* at 36:13-20; Robertiello Dep. at 43:21-44:6, 106:5-107:8, Ex. 5 to Levin Decl.

[21]     *See* Deposition of Jennifer Feinerman ("Feinerman Dep.") at 371:4-372:4, Ex. 1 to Stern Decl.

[22]     *See id.* at 371:4-22.

[23]     *See id.* at 382:18-383:2.

[24]     *See* Pl 56.1 ¶ 20 (citing Mackay Dep. at 56:1-60:25, Ex. 7 to Stern Decl.).

conferences. T-Mobile states that Feinerman failed to attend several conferences and missed more conferences than any other Regional Director.[25] Feinerman states that she attended at least some portion of all the conferences, except those that occurred while she was on maternity leave.[26]

T-Mobile scheduled a conference in Scottsdale, Arizona to take place in February 2006.[27] Prior to the conference, Feinerman had a conversation with her supervisor, James Robertiello, during which Feinerman explained that it was difficult for her to find child care for extended out-of-town trips.[28] Feinerman asserts that she planned on attending the February 2006 conference, but ultimately was unable to attend due to a stomach flu.[29]

In late March or early April 2006, Feinerman spoke to Mackay and told him that she was "having difficulty attending the seminars" because of her

---

[25] *See* Mackay Dep. at 32:8-11, 33:4-10, 37:9-13, Ex. 4 to Levin Decl.; Robertiello Dep. at 78:15-20, Ex. 5 to Levin Decl.; Deposition of David Lampkin, T-Mobile's Acting Divisional Director of the East ("Lampkin Dep.") at 21:4-20, Ex. 4 to Levin Decl.

[26] *See* Feinerman Dep. at 247:2-14, 356:21-9, Ex.1 to Stern Decl.

[27] *See* Def. 56.1 ¶ 33; Pl. 56.1 ¶ 33.

[28] *See* Def. 56.1 ¶¶ 33, 34; Pl. 56.1 ¶¶ 33, 34.

[29] *See* 2/6/06 Email from Robertiello to Mackay, Ex. 7 to Levin Decl.

7

child care responsibilities.[30] During this conversation Mackay explained to Feinerman that he considered the conferences important and that he expected Feinerman to attend them.[31]

Feinerman gave birth to her second child on October 23, 2006.[32] However, Feinerman did not take her maternity leave immediately.[33] On November 14, 2006, Feinerman contacted Robertiello and informed him that she intended to begin her maternity leave on December 15, 2006.[34] T-Mobile had scheduled a conference from December 12, 2006 through December 14, 2006 in Seattle, Washington.[35] Feinerman was not planning to attend this conference and Robertiello convinced Feinerman to instead take her maternity leave from December 11, 2006 through March 2, 2006 so that she would be officially excused from the conference.[36]

---

[30]    *See* Def. 56.1 ¶¶ 35, 36; Pl. 56.1 ¶¶ 35, 36.

[31]    *See* Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37.

[32]    *See* Feinerman Dep. at 125:14-23, Ex. 1 to Stern Decl.

[33]    *See id.* at 160:21-161:16, Ex. 1 to Stern Decl.

[34]    *See id.*

[35]    *See* Robertiello Dep. at 99:10-100:14, 108:6-110:7, Ex. 3 to Stern Decl.

[36]    *See id.*

8

In November 2006, T-Mobile conducted Feinerman's annual performance review.[37] Feinerman met with Robertiello to discuss her evaluation.[38] During this meeting, Robertiello informed Feinerman that her failure to attend every day of all the conferences made her less visible within the company, which in turn made her appear less vital.[39] Despite Feinerman's failure to attend conferences or portions of conferences, Robertiello's evaluation of Feinerman indicated that she met or exceeded T-Mobile's expectations in all areas except customer retention where she only "[m]et some expectations."[40] Robertiello's evaluation also indicated that Feinerman achieved one hundred and eleven percent of her annual sales quota and that the number of sales people Feinerman supervised that achieved their annual sales quotas was the "[b]est in [her] division."[41]

As part of his evaluation of Feinerman, Robertiello completed a form titled "Q4 2006 Business Sales Leader Profile" in which he "grade[d] [Feinerman]

---

[37]     *See* Def. 56.1 ¶ 40; Pl. 56.1 ¶ 40.

[38]     *See id.*

[39]     *See* Feinerman Dep. at 134:14-22, 138:24-139:7, Ex. 1 to Stern Decl.

[40]     2006 Sales Review Custom Goals for Jennifer A. Feinerman, Ex. 4 to Stern Decl.

[41]     *Id.*

9

on how well [she] perform[ed] against the leadership competencies and values as ascribed by [T-Mobile]."[42] Overall, Robertiello found that Feinerman met T-Mobile's expectations.[43] In a section titled "Most Significant Blue Chip Project," Robertiello wrote "2 babies in 2 years ☺."[44] Blue chip projects were for employees on the staff side of T-Mobile's business.[45] Because Feinerman was a salesperson, she was not assigned a blue chip project.[46] Robertiello was not required to write anything in the "Most Significant Blue Chip Project" section for sales employees.[47]

In or about March 2007, Lampkin became T-Mobile's Acting Divisional Director of the East.[48] Lampkin replaced Robertiello as Feinerman's direct supervisor.[49] Shortly after returning from maternity leave, Feinerman was

---

[42]     Robertiello Dep at 145:3-147:12, Ex. 3 to Stern Decl.; Q4 2006 Business Sales Leader Profile ("Leader Profile"), Ex. 4 to Stern Decl.

[43]     *See* Leader Profile.

[44]     *Id.*

[45]     *See* Robertiello Dep. at 146:18-147:4, Ex. 3 to Stern Decl.

[46]     *See id.*

[47]     *See id.*

[48]     *See* Def. 56.1 ¶ 42; Pl. 56.1 ¶ 42.

[49]     *See id.*

10

required to attend a conference called the Wireless Enterprise Symposium ("WES") scheduled to take place from May 8, 2007 through May 10, 2007 in Orlando, Florida .[50] Feinerman did not arrive at WES until May 9, 2007 because she brought her children to her mother's house in Orlando, prior to attending the meeting.[51] After the WES, Feinerman and Lampkin had a telephone conversation in which Lampkin informed Feinerman that she had not been visible enough during the conference and that she should make herself more visible at future conferences.[52]

T-Mobile used coaching plans in order to "coach individuals" both in "areas of opportunity" and in "areas of strength."[53] On June 15, 2007, Lampkin completed a "Coaching Plan Summary" for Feinerman.[54] Lampkin acknowledged that Feinerman had "established herself in her region as a good leader" and that she was a "good team builder [who] has built a sold and loyal management team

---

[50]    See Def. 56.1 ¶ 43; Pl. 56.1 ¶ 43.

[51]    See Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44.

[52]    See Feinerman Dep. at 180:4-22, 187:8-16, Ex. 2 to Levin Decl.

[53]    Lampkin Dep. at 33:12-18, Ex. 5 to Stern Decl.

[54]    See Coaching Plan Summary, Ex. 6 to Stern Decl.

11

within her region."[55]  However, Lampkin noted that Feinerman had "missed several opportunities to engage in the culture, grow with the leadership team, and positively promote her employees."[56]  Lampkin indicated that he believed Feinerman's performance would be stronger if she "attend[ed] all [Regional Director] (and above) and leadership meetings."[57]  Lampkin also indicated that "[m]ore frequent appearances outside of market at peer-level meetings" would be a "tangible measure of [Feinerman's] success."[58]  In a space marked "Top 3 Areas for Improvement" Lampkin noted that Feinerman's year-over-year growth had decreased thirteen percent compared to 2006.[59]

On June 20, 2007, Feinerman met with Lampkin to discuss a five-day conference scheduled to take place in July 2007 in Austin, Texas.[60]  T-Mobile alleges that Feinerman told Lampkin that she was unable to attend the conference

---

[55]   *Id.*

[56]   *Id.*

[57]   *Id.*

[58]   *Id.*

[59]   *Id.*

[60]   *See* Def. 56.1 ¶ 46; Pl. 56.1 ¶ 46.

because she could not find child care.[61]  Feinerman contends that she never said it was impossible for her to attend the conference, only that she could not attend all five days.[62]  Lampkin told Feinerman that travel was a requirement of her job and that she would have to commit to attending conferences that were required for Regional Directors.[63]  Feinerman alleges that at some point during this conversation Lampkin "jok[ed] about how [men find it] quite enjoyable to get away from their children, and it is difficult for [Feinerman], so it would be easier for a man to be in a position" such as Regional Director.[64]

Lampkin gave Feinerman three options: (1) commit to fulfilling the travel requirements of the Regional Director position; (2) look for other positions within T-Mobile that did not require travel; or (3) find a position outside of T-Mobile.[65]  Feinerman told Lampkin that she wanted to keep her position with T-Mobile, but would need an accommodation that would exempt her from some of

---

[61]  *See* Feinerman Dep. at 230:11-21, Ex. 2 to Levin Decl.

[62]  *See id.* at 228:20-229:4, Ex. 2 to Levin Decl.

[63]  *See* Def. 56.1 ¶ 48; Pl. 56.1 ¶ 48.

[64]  Feinerman Dep. at 236:19-237:4, Ex. 2 to Levin Decl.

[65]  *See* Def. 56.1 ¶ 49; Pl. 56.1 ¶ 49.

the required travel.[66]

Approximately one week after Feinerman and Lampkin's meeting, Lampkin called Feinerman.[67] During the call Lampkin asked Feinerman whether she would be attending the Austin conference.[68] T-Mobile alleges that Feinerman told Lampkin that she was unable to attend the meeting.[69] Feinerman alleges that she never refused to attend the meeting, but admits that she asked Lampkin to reconsider excusing her from travel or decreasing her travel requirements.[70] During this conversation Feinerman told Lampkin that she was not interested in pursuing other positions at T-Mobile because a position at T-Mobile with more limited travel would require her to accept a demotion and a diminution in pay.[71]

On July 18, 2007, Lampkin sent Feinerman an email that summarized

---

[66]   *See* Feinerman Dep. at 238:9-239:15, Ex. 2 to Levin Decl.

[67]   *See* Def. 56.1 ¶ 52; Pl. 56.1 ¶ 52.

[68]   *See id.*

[69]   *See* Def. 56.1 ¶ 53 (citing Feinerman Dep. at 241:13-20, Ex. 2 to Levin Decl.).

[70]   *See* Feinerman Dep. at 241:21-242:6, Ex. 2 to Levin Decl.

[71]   *See* Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55; Feinerman Dep. at 351:17-352:14, Ex. 1 to Stern Decl.

their discussions regarding travel.[72] In his email Lampkin reviewed the three

options that he had presented to Feinerman during their June 20, 2007 meeting and

stated "I want to be clear, it is our desire to have you stay in your current role and

commit to the requirements of your position. However, I understand that if it isn't

possible for you to do so, then you'll need to pursue other options as described

above."[73] Feinerman was the only Regional Director who was asked to

affirmatively commit to attending all future conferences.[74]

Despite Lampkin's statement in his July 18, 2007 email, Feinerman

alleges that T-Mobile had already decided to terminate her employment regardless

of whether she agreed to travel to future conferences.[75] As evidence that T-Mobile

had already made the decision to terminate her, Feinerman points to the fact that

on July 6, 2007, Lampkin exchanged emails with Kristi Miller, an employee in T-

Mobile's Human Resources Department, regarding the appropriate severance

package to offer Feinerman.[76] Additionally, Feinerman notes that on July 13,

---

[72]     Def. 56.1 ¶ 56; Pl. 56.1 ¶ 56.

[73]     7/18/07 Email from Lampkin to Feinerman, Ex. 8 to Levin Decl.

[74]     *See* Feinerman Dep. at 351:2-16, Ex. 1 to Stern Decl.

[75]     *See* Pl. 56.1 ¶ 60.

[76]     *See* 7/6/07 Email from Kristi Miller, T-Mobile Human Resources
Employee, to Lampkin and Mackay, Ex. 6 to Stern Decl.

2007, Miller wrote an email to Sandy Frye, another employee in T-Mobile's

Human Resources Department, stating:

> [I]t dawned on me the other day that if we move forward
> with separating both [redacted] and Jennifer Feinerman
> then we will be terminating the only two women in higher
> level positions in the [business-to-business] organization.
> There is already a perception in the organization that it is
> a man's world. I understand the reasoning behind both of
> the situations, but I wanted to ensure I brought this to your
> attention. I don't believe we have any internal female
> candidates that are ready for promotion. It sounds like the
> top candidates are all males.[77]

On July 20, 2007, Feinerman sent Lampkin an email responding to

his July 18, 2007 email.[78] In her email Feinerman stated:

> Upon my employment with [T-Mobile], my [Regional
> Director] position required little to no travel. The new
> fangled [sic] requirement that my [Regional Director]
> position require[s] more travel outside my local market will
> interfere with my obligations to my [two] infant children
> ages [two years] and [eight] months. Remarkably, other
> similarly situated male co workers are not required to
> travel.[79]   It is apparent that your requirement and
> ultimatum is intended to force me out of a career which I

---

[77]   7/13/07 Email from Miller to Frye, Ex. 6 to Stern Decl.

[78]   *See* Def. 56.1 ¶ 61; Pl. 56.1 ¶ 61; 7/20/07 Email from Feinerman to
Lampkin, Ex. 8 to Levin Decl.

[79]   Feinerman was referring to Keith Gould, a T-Mobile Sales Manager.
*See infra* Part II.C.

truly love.[80]

On or about July 31, 2007, Lampkin called Feinerman together with a representative from Human Resources.[81] Lampkin asked Feinerman whether she had thought about her options regarding her employment with T-Mobile.[82] Feinerman reiterated that she did not want to leave T-Mobile but also said she could not commit to all the required travel without an accommodation.[83] Lampkin responded by offering Feinerman a severance package.[84]

On August 10, 2007, Feinerman had a telephone conversation with Miller and Barry Thomas, T-Mobile's Divisional Director of the West.[85] Miller asked Feinerman to take a two week paid administrative leave to consider her options regarding her employment with T-Mobile.[86] Feinerman stated that she did

---

[80]   7/20/07 Email from Feinerman to Lampkin, Ex. 8 to Levin Decl.

[81]   *See* Def. 56.1 ¶ 66; Pl. 56.1 ¶ 66.

[82]   *See* Def. 56.1 ¶ 67; Pl. 56.1 ¶ 67.

[83]   *See* Feinerman Dep. at 272:11-273:5, Ex. 3 to Levin Decl.; 7/31/07 Email from Lampkin to Mackay, Ex. 8 to Levin Decl. (summarizing Lampkin and Feinerman's telephone conversation).

[84]   *See* Feinerman Dep. at 273:12-25, Ex. 3 to Levin Decl.; 7/31/07 Email from Lampkin to Mackay, Ex. 8 to Levin Decl.

[85]   *See* Def. 56.1 ¶ 69; Pl. 56.1 ¶ 69.

[86]   *See* Def. 56.1 ¶ 70; Pl. 56.1 ¶ 70.

17

not need an administrative leave and that she wanted to continue working.[87]  On

August 14, 2007, Lampkin sent Feinerman an email instructing her to take an

administrative leave "begin[ning] immediately" through August 24, 2007.[88]

Feinerman did not return to work at T-Mobile and, on August 28,

2007, Miller sent Feinerman a letter informing her that T-Mobile had "processed

[her] voluntary resignation for dissatisfaction with work schedule and for failure to

return to work from administrative leave, effective August 24, 2007."[89]  Feinerman

alleges that her resignation was not voluntary and she was prepared to continue

her employment with T-Mobile.[90]  Although Mackay was ultimately responsible

for the decision to terminate Feinerman, Lampkin, Miller, and Frye were involved

in the decision-making process.[91]

## C.    Keith Gould's Employment with T-Mobile

Keith Gould worked as a Sales Manager in T-Mobile's Philadelphia

---

[87]    *See* Def. 56.1 ¶ 72; Pl. 56.1 ¶ 72.

[88]    8/14/07 Email from Lampkin to Feinerman, Ex. 8 to Levin Decl.

[89]    8/28/07 Letter from Miller to Feinerman, Ex. 8 to Levin Decl.

[90]    *See* Feinerman Dep. at 290:24-291:18, Ex. 1 to Stern Decl.

[91]    *See* Mackay Dep. at 7:22-8:17, Ex. 7 to Stern Decl.

market.[92]  T-Mobile had approximately seventy Sales Managers or Senior Sales

Managers.[93]  Sales Managers are two job categories junior to Regional Directors

and have smaller territories in terms of both number of customers and financial

responsibility.[94]  Gould oversaw a team of seven T-Mobile account executives or

Major Account Executives.[95]  Sales Managers were expected to attend some out-

of-town conferences.[96]  However, they were not required to attend as many

conferences as Regional Directors.[97]  T-Mobile contends that it considered the

Sales Managers' attendance at conferences less critical than the Regional

Directors' attendance.[98]

     Gould failed to attend any required out-of-town conferences because

---

[92]    *See* Def. 56.1 ¶ 87; Pl. 56.1 ¶ 87.

[93]    *See* Def. 56.1 ¶ 91; Pl. 56.1 ¶ 91.

[94]    *See* Def. 56.1 ¶ 88; Pl. 56.1 ¶ 88.

[95]    *See* Def. 56.1 ¶ 91; Pl. 56.1 ¶ 91.

[96]    *See* Keith Gould's 8/9/07 Employee Request for Accommodation, Ex.
10 to Levin Decl. (estimating that Gould was required to attend four to five
meetings per year); Robertiello Dep at 89:17-2, Ex. 5 to Levin Decl. (stating that
Gould "would have been required at a maximum to attend two meetings per year
out of town") Mackay Dep. at 28:17-22, Ex. 7 to Stern Decl.

[97]    *See* Def. 56.1 ¶¶ 88, 90; Pl. 56.1 ¶¶ 88, 90.

[98]    *See* Robertiello Dep. at 95:8-18, 105:24-107:8, Ex. 5 to Levin Decl.

19

he had an acute fear of flying.[99]  Gould began informally requesting to be excused from traveling to conferences on or before January 16, 2006.[100]  On August 9 2007, Gould completed an Employee Request for Accommodation form.[101]  Gould requested that he be allowed to obtain information from out-of-town meetings via "power point slides or conference call."[102]  In support of this request, Gould submitted medical documentation of his fear of flying.[103]

Eventually, T-Mobile told Gould that he either had to fulfill his travel requirements or accept a different position within T-Mobile.[104]  In January 2008, Gould chose to take a position as an Account Manager at T-Mobile.[105]  The Account Manager position was two job categories junior to Gould's position as

---

[99]   *See* Def. 56.1 ¶ 89; Pl. 56.1 ¶ 89.

[100]   *See* 1/16/06 Email from Keith Gould, T-Mobile Sales Manager, to Peter Klinges, T-Mobile Regional Director and Gould's Supervisor, Ex. 11 to Stern Decl.

[101]   *See* Employee Request for Accommodation, Ex. 10 to Stern Decl.

[102]   *Id.*

[103]   *See* Def. 56.1 ¶ 96; Pl. 56.1 ¶ 96.

[104]   *See* Def. 56.1 ¶ 97; Pl. 56.1 ¶ 97.

[105]   *See* Def. 56.1 ¶ 98; Pl. 56.1 ¶ 98; 1/25/08 Email from Gould to Miller, Ex. 12 to Stern Decl.

Sales Manager, but it did not require travel.[106]

## III. APPLICABLE LAW

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[107] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'"[108] "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[109]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to

---

[106]    *See* Def. 56.1 ¶ 98; Pl. 56.1 ¶ 98.

[107]    Fed. R. Civ. P. 56(c).

[108]    *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[109]    *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)). *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[110] To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[111] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[112] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[113]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[114] However, "'only admissible evidence need be considered by the trial court in ruling on a motion for

[110]   *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[111]   *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[112]   *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[113]   *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[114]   *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

22

summary judgment.'"[115] "'Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[116] Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[117]

"'It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'"[118] "Courts within the Second Circuit have not hesitated to grant defendants summary judgment in such cases where . . . plaintiff has offered little or no evidence of discrimination."[119]

---

[115]    *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).

[116]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).  *Accord Anderson*, 477 U.S. at 249.

[117]    *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

[118]    *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)) (alteration in original).  *Accord Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to . . . other areas of litigation.").

[119]    *Alphonse v. State of Connecticut Dep't of Admin. Servs.*, No. 3:02 CV 1195, 2004 WL 904076, at *7 (D. Conn. Apr. 21, 2004) (quotation marks and citation omitted).

Nonetheless, caution must be exercised in granting summary judgment in

employment discrimination cases where the employer's intent is genuinely at issue

and circumstantial evidence may reveal an inference of discrimination.[120]

However, "'[e]ven in the discrimination context, a plaintiff must prove more than

conclusory allegations of discrimination to defeat a motion for summary

judgment.'"[121] "'[M]ere conclusory allegations, speculation or conjecture will not

avail a party resisting summary judgment.'"[122]

## B.    Discrimination Under Title VII[123]

Title VII prohibits an employer from "discriminat[ing] against any

individual with respect to [her] compensation, terms, conditions, or privileges of

---

[120]    *See Feingold*, 366 F.3d at 149.

[121]    *Flakowicz v. Raffi Custom Photo Lab, Inc.*, No. 02 Civ. 9558, 2004 WL 2049220, at *8 (S.D.N.Y. Sept. 13, 2004) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).

[122]    *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) (alteration in original)). *Accord Cameron v. Community Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) ("'[P]urely conclusory allegations of discrimination, absent any concrete particulars,' are insufficient" to satisfy an employee's burden on a motion for summary judgment) (quoting *Meiri*, 759 F.2d at 998) (alteration in original).

[123]    Feinerman's claims brought pursuant to the NYSHRL and NYCHRL are also analyzed under the Title VII framework. *See Cruz v. Coach Stores, Inc.*, 202 F. 3d 560, 565 n.1 (2d Cir. 2000).

24

employment, because of such individual's race, color, religion, sex, or national origin."[124] "To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting laid out by *McDonnell Douglas Corp. v. Green*."[125] "[T]he plaintiff bears the initial burden of establishing a prima facie case of discrimination."[126] A plaintiff meets this burden by showing that: "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."[127] The Second Circuit has "characterized the evidence necessary to satisfy this initial burden as 'minimal' and 'de minimis.'"[128]

Once a plaintiff establishes a prima facie case of gender discrimination, a rebuttable presumption of unlawful discrimination arises and the

---

[124]    42 U.S.C. § 2000e-2(a)(1).

[125]    *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005)).

[126]    *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008).

[127]    *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003)).

[128]    *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

burden shifts to the employer to"'articulate some legitimate, nondiscriminatory reason for the' [adverse act]."[129]  If the employer articulates such a reason, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"[130]  At this final stage of analysis, "'[w]hether judgment as a matter of law is appropriate in any particular case' depends on a careful review of the total evidence adduced."[131]  Relevant considerations "include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."[132]  In other words, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains

---

[129]     *Leibowitz*, 584 F.3d at 499 (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)) (alteration in original)

[130]     *Id.* (quoting *Patterson*, 375 F.3d at 221).

[131]     *Cross v. New York City Transit Auth.*, 417 F.3d 241, 249 (2d Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148-49 (2000)).

[132]     *Reeves*, 530 U.S. at 148-49.

26

at all times with the plaintiff.'"[133] Direct evidence of discrimination is not

required; circumstantial evidence will suffice.[134]

The anti-retaliation clause of Title VII prohibits an employer from

"discriminat[ing] against any of his employees . . . because [s]he has opposed any

practice made an unlawful employment practice by this subchapter, or because

[s]he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter."[135] "Claims for

retaliation are analyzed under the same burden-shifting framework established for

Title VII cases."[136] To establish a prima facie case of retaliation, the plaintiff must

show:

> "[1] that [] [she] engaged in protected
> participation . . . under Title VII . . . , [2] that the employer
> was aware of this activity, [3] that the employer took
> adverse action against the plaintiff, and [4] that a causal
> connection exists between the protected activity and the

---

[133]    *Liebowitz*, 584 F.3d at 499 (quoting *Patterson*, 375 F.3d at 221)
(alteration in original).

[134]    *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) (noting that
the rule of civil litigation generally applicable to Title VII cases "requires a
plaintiff to prove his case by a preponderance of the evidence using direct or
circumstantial evidence" (quotation marks omitted)).

[135]    42 U.S.C. § 2000e-3(a).

[136]    *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

adverse action, i.e., that a retaliatory motive played a part
in the adverse employment action."[137]

## IV. DISCUSSION

### A. Feinerman Has Stated a Prima Facie Case of Gender Discrimination

As a preliminary matter, it is important to note that Feinerman does

not claim that T-Mobile discriminated against her because she is a parent. Rather,

Feinerman claims that T-Mobile discriminated against her by applying the gender-

based stereotype that a woman's family obligations will prevent her from

performing her job adequately. Use of such a stereotype is a form of gender

discrimination.[138]

Feinerman has satisfied the first and third elements of her prima facie

case because, as a woman, Feinerman is a member of a protected class and she was

subjected to an adverse employment action when she was terminated.[139] T-Mobile

---

[137]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199,
205-06 (2d Cir. 2006) (quoting *Cifra v. General Elec. Co.*, 252 F.3d 205, 216 (2d
Cir. 2001)) (alterations in original).

[138]    *See Back v. Hasting on Hudson Union Free Sch. Dist.*, 365 F.3d 107,
119-22 (2d Cir. 2004) ("[S]tereotyping of women as caregivers can by itself and
without more be evidence of an impermissible, sex-based motive.").

[139]    *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir.
1999) ("There is no dispute that as a black woman who was terminated from her
job, [plaintiff] satisfied the first and third elements of her prima facie case, i.e., she

argues that Feinerman cannot establish a prima facie case of gender discrimination because she fails to show that she was qualified for her position or that she was terminated under circumstances giving rise to an inference of gender discrimination.[140]

### 1. Feinerman Was Qualified for the Regional Director Position

T-Mobile argues that Feinerman does not satisfy the second element of her prima facie case for gender discrimination because "she has not — and cannot — demonstrate that she was performing her duties satisfactorily."[141] T-Mobile's argument fails because it mischaracterizes the showing Feinerman must make.

The Second Circuit has stated two variations of the second element of a plaintiff's prima facie case. The majority of cases require the plaintiff to demonstrate that she "was qualified for the position" at issue.[142] However, some

---

is a member of a protected class who suffered an adverse employment action.").

[140]  *See* T-Mobile USA, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment ("Def. Mem.") at 12-13.

[141]  *Id.* at 13.

[142]  *Liebowitz*, 584 F.3 at 498 (citing *Terry*, 336 F.3d at 137-38).  *Accord Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) (quoting *Holcomb*, 521 F.3d at 138); *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008); *Feingold*, 366 F.3d at 152 (citing *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118

cases state that a plaintiff must show she was "performing [her] duties satisfactorily."[143] The Second Circuit clarified the standard in *Slattery v. Swiss Reinsurance America Corp.*[144] *Slattery* held that "qualified for the position" and "performing . . . satisfactorily" were "mere variation[s] in terminology" that "would not be significant so long as, in substance, all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer."[145] Accordingly, *Slattery* concluded that the district court erred by "overstat[ing] the requirements for a prima facie case" and requiring the plaintiff to show that he satisfied his employer.[146]

"To show 'qualification' sufficiently to shift the burden of providing some explanation for discharge to the employer, the plaintiff need not show perfect performance or even average performance. Instead, she need only make

---

(2d Cir. 2002)).

[143]    *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005) (citing *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001)); *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir. 2002); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

[144]    *See* 248 F.3d 87 (2d Cir. 2001).

[145]    *Id.* at 91-92.

[146]    *Id.*

30

the minimal showing that *she possesses the basic skills necessary for performance*

*of [the] job*."[147] In *Gregory v. Daly*, the Second Circuit explained that

> [a]n employer's dissatisfaction with even a qualified
> employee's performance may . . . ultimately provide a
> legitimate, non-discriminatory reason for the employer's
> adverse action. But . . . the qualification prong as to which
> the initial burden lies on the plaintiff, cannot be
> transformed into a requirement that the plaintiff anticipate
> and disprove an employer's explanation that inadequate
> ability or performance justified the job action at issue.[148]

*Gregory* additionally stated that

> [i]n a discharge case in which the employer has already
> hired the employee into the job in question, the inference
> of minimal qualification is . . . easier to draw than in a
> hiring or promotion case because, by hiring the employee,
> the employer itself has already expressed a belief that she
> is minimally qualified. Moreover, when . . . the employer
> has retained the plaintiff for a significant period of time
> and promoted her, the strength of the inference that she
> possesses the basic skills required for her job is
> heightened.[149]

T-Mobile argues that Feinerman failed to establish that she was

qualified for the Regional Director position because she failed to attend all the

---

[147]     *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (citations and quotations marks omitted) (emphasis in original).

[148]     *Id.* at 696-97.

[149]     *Id.* at 696.

31

conferences that were required for Regional Directors.[150] This argument goes toward whether Feinerman carried out the responsibilities of her position satisfactorily and not whether she possessed the basic skills necessary to be a Regional Director. Feinerman has demonstrated that T-Mobile hired her as a Regional Director, retained her in that position from November 2002 to August 2007 despite terminating approximately seven Regional Directors in 2005, and gave her satisfactory performance evaluations. This is sufficient to show that Feinerman was qualified for the Regional Director position.[151]

### 2. Feinerman Was Terminated Under Circumstances Giving Rise to an Inference of Discrimination

It is undisputed that T-mobile required Feinerman to affirmatively commit to attending all future meetings, even though other Regional Directors

---

[150]    *See* Def. Mem. at 13-14.

[151]    *See Gregory*, 243 F.3d at 167 (holding that plaintiff's allegations that her employer "retained her services for ten years and promoted her into successively higher positions" and that her employer's allegations that she lacked qualification for her position were "part of a campaign of discrimination against her" "sufice[d] to plead her qualification for the position"); *Terry*, 336 F.3d at 138 (holding that significant job experience and positive evaluations "on a wide range of job elements" established a prima facie case of job qualification); *Winston v. Verizon Services Corp.*, 633 F. Supp. 2d 42, 59-50, (S.D.N.Y. 2009) (concluding that relevant degrees, many years of employment with the defendant company, and positive reviews from supervisors and customers was sufficient to establish plaintiff's qualification for her position).

were not asked for an affirmative commitment. Feinerman argues that this requirement was based on the stereotype that she, as a mother, would miss future meetings in order to care for her children.[152] Feinerman points to the following as evidence of discrimination: (1) Robertiello suggested that Feinerman start her maternity leave earlier than she had planned in order to be formally excused from the Seattle conference that she did not plan on attending; (2) Lampkin noted on Feinerman's June 15, 2007 Coaching Plan Summary that the year-over-year growth in Feinerman's region was down thirteen percent compared to 2006 even though Feinerman had been on maternity leave during a portion of the relevant time period; (3) Robertiello wrote on Feinerman's Q4 2006 Leader Profile that her "Most Significant Blue Chip Project" was "2 babies in 2 years ☺"; (4) during the June 20, 2007 meeting, Lampkin joked that it would be easier for a man to do Feinerman's job because men enjoy time away from their children; (5) Miller noted in an email (the "Miller email") that T-Mobile was about to terminate the only two women in the business-to-business organization and this might contribute to the "perception in the organization that it is a man's world"; and (6)

---

[152]    *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Opp. Mem.") at 21.

Gould was excused from out-of-town conferences.[153]

The first two events that Feinerman points to do not provide evidence of gender discrimination. Robertiello's suggestion that Feinerman change the dates of her maternity leave was not based on an assumption about women with children. It was advice based on Feinerman's stated intent to miss the Seattle conference. Lampkin's notation on Feinerman's June 15, 2007 Coaching Plan Summary was a statement of fact and, as such, was unrelated to Feinerman's gender.

As to Fienerman's argument that Gould was excused from the conferences, the evidence shows that while Gould was a Sales Director he never attended any conferences even though Sales Directors were required to attend some conferences. This does not show that Gould was *excused* from the conferences. There is no evidence that T-Mobile granted Gould permission to miss the conferences without repercussion. In fact, T-Mobile ultimately gave Gould the same choice it gave to Feinerman — fulfill the travel requirements or find a new position.

Even if T-Mobile treated Gould's failure to attend conferences as a less serious infraction than Feinerman's failure to attend, this does not show that

---

[153]    *See id.* at 20-21.

T-Mobile discriminated against Feinerman on the basis of her gender because
Feinerman and Gould were not similarly situated. A "showing that the
employer . . . treated [the plaintiff] less favorably than a similarly situated
employee outside [her] protected group" can give rise to an inference of
discrimination.[154] The plaintiff and the allegedly favored employee must be
similarly situated in "all material respects."[155] "What constitutes 'all material
respects' . . . varies somewhat from case to case and . . . must be judged based on
(1) whether the plaintiff and those he maintains were similarly situated were
subject to the same workplace standards and (2) whether the conduct for which the
employer imposed discipline was of comparable seriousness."[156]

           Other than Gould's request for a travel accommodation, Feinerman
and Gould are not similar in any respect. Gould's job description and
responsibilities as a Sales Manager were not similar to Feinerman's more senior
position as a Regional Director. Furthermore, T-Mobile asked Gould to attend
fewer conferences as a Sales Manager than it asked Feinerman to attend as a
Regional Director. Because, Feinerman and Gould are not similarly situated, the

      [154]  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2009).

      [155]  *Id.*

      [156]  *Id.* at 40.

fact that T-Mobile may have treated Gould more favorably than Feinerman with regard to his failure to attend conferences does not give rise to an inference that T-Mobile discriminated against Feinerman on account of her gender.[157]

However, the June 20, 2007 meeting where Feinerman states that Lampkin joked that it would be easier for a man to be in Feinerman's position because men enjoy time away from their children, Robertiello's notation of "2 babies in 2 years ☺" on Feinerman's Q4 2006 Leader Profile, and the Miller email provide some evidence that Feinerman's termination could have been the result of discrimination. Viewed in the light most favorable to Feinerman, Lampkin's joke tends to show that he believes women with children are less willing or less able to

---

[157] *See Dorcely v. Wyandanch Union Free School Dist.*, — F. Supp. 2d —, No. 06 Civ. 1265, 2009 WL 3232866, at *18 (S.D.N.Y. Sept. 30, 2009) (finding that plaintiff was not similarly situated to other employees when "Plaintiff ha[d] not set forth evidence that those employees' responsibilities and seniority were similar"); *Canales-Jacobs v. New York State Office of Court Admin.*, 640 F. Supp. 2d 482, 505 (S.D.N.Y. 2009) (concluding that plaintiff, a Senior Court Clerk, was not similarly situated to a Senior Court Officer in part because the Senior Court Officer had "significantly different duties and responsibilities" than plaintiff); *Johnson v. County of Nassau*, 480 F. Supp. 2d 581, 598 (E.D.N.Y. 2007) (finding that plaintiff was not similarly situated to the three employees to which he compared himself because he "failed to offer competent evidence from which any reasonable trier of fact could infer that any of the three individuals . . . had substantially similar job responsibilities"); *Querry v. Messar*, 66 F. Supp. 2d 563, 571-72 (S.D.N.Y. 1999) (finding that plaintiff, a police officer, was not similarly situated to a police sergeant because "the sergeant was of higher rank than the plaintiff and his duties were different from plaintiff's").

travel than men and therefore women with children are less suitable for the

Regional Director position. Robertiello's notation marginalizes Feinerman's

business achievements and could indicate a belief that having babies is a woman's

most significant accomplishment. The Miller email provides some circumstantial

evidence that T-Mobile was concerned that its work environment may not have

been female-friendly.

Lampkin's joke, Robertiello's notation, and the Miller email provide

scant evidence of gender discrimination. Robertiello's notation is not probative of

T-Mobile's discriminatory intent because the notation was temporally removed

from Feinerman's termination and Robertiello was not directly involved in the

decision to terminate Feinerman.[158] By contrast, Lampkin's joke cannot be

considered a stray remark because it occurred while T-Mobile was actively

considering terminating Feinerman's employment, and Lampkin participated in

that decision.[159] Lampkin's joke together with Miller's email provide sufficient

---

[158]     *See Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (explaining that whether the remark is made by someone involved in the decision-making process, and "the remark's relation to the allegedly discriminatory behavior" are probative of whether an employer was motivated by discrimination).

[159]     *See Sassaman*, 566 F.3d at 314 (finding the fourth element of plaintiff's prima facie case satisfied where supervisor made a discriminatory comment during a phone call in which he also pressured plaintiff to resign his

evidence to satisfy Feinerman's "minimal" burden of showing circumstances

giving rise to an inference of discrimination and Feinerman has shown a prima

facie case of discrimination.

## B. T-Mobile Has Articulated a Legitimate, Nondiscriminatory Reason for Terminating Feinerman

Feinerman's prima facie case of discrimination does not end the

inquiry — it merely shifts the burden to T-Mobile to show a legitimate

nondiscriminatory reason for terminating Feinerman's employment. T-Mobile has

shown that it repeatedly warned Feinerman that she must attend all the

conferences that were required for Regional Directors. Even after the warnings

began, Feinerman continued to miss at least portions of conferences and, when

asked, she explicitly refused to commit to attending future conferences in their

entirety. All T-Mobile Regional Directors, regardless of their gender, were

---

position); *Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (concluding that plaintiff had shown "direct evidence of discriminatory animus" when "comments [were] made directly to" the plaintiff by someone with "enormous influence in the decision-making process"); *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999) ("[T]he impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision . . . this is true even absent evidence of illegitimate bias on the part of the ultimate decisionmaker, so long as the individual shown to have impermissible bias played a meaningful role in the promotion process."); *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 162-63 (2d Cir. 1998) (holding that age-related remarks were not "stray" when made by decision-makers near the time of plaintiff's discharge).

expected to attend the conferences.[160] Feinerman's unwillingness to comply with the requirements of her position amounts to a legitimate, nondiscriminatory reason to terminate her.[161]

---

[160]     Feinerman argues that traveling to conferences was not a requirement of her job because traveling did not appear in any Regional Director job description, the primary purpose of the meetings was socializing, the meetings did not help her reach her sales goals, and the meetings were unimportant to T-Mobile as evidenced by the fact that they were ultimately cancelled due to financial concerns. *See* Opp. Mem. at 3-4, 24. These arguments are irrelevant because T-Mobile clearly communicated that Regional Directors were expected to attend the conferences and T-Mobile has the exclusive authority to specify any nondiscriminatory criteria for the Regional Director position. *See Thornley v. Penton Publ.*, 104 F.3d 26, 29 (2d Cir. 1997) ("[A]n employer who is sued on allegations of age discrimination is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury."); *Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 921-22 (2d Cir. 1981) (holding that an employee may be discharged "on the basis of subjective business judgments, for any reason that is not discriminatory"); *Ennis v. Sonitrol Mgmt. Corp.*, No. 02 Civ. 9070, 2006 WL 177173, at *18 (S.D.N.Y. Jan. 25, 2006) (stating that in a Title VII case where one of the alleged reasons for plaintiff's termination was his failure to attend weekly meetings, "[t]he court will not entertain plaintiff's arguments questioning the need for his attendance at the weekly meetings").

[161]     *See Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (holding that defendant articulated a nondiscriminatory reason for terminating plaintiff when defendant presented evidence that plaintiff's job performance "did not measure up to that required of [her position]"); *Young v. Benjamin Dev. Co., Inc.*, No. 03 Civ. 10209, 2009 WL 498933, at *9 (S.D.N.Y. Feb. 17, 2009) (finding employer proffered a legitimate nondiscriminatory reason for terminating plaintiff when, even after a warning, plaintiff refused to complete tasks that were assigned to him); *Mangaroo v. Boundless Techs., Inc.*, 253 F. Supp. 2d 390, 399 (E.D.N.Y. 2003) (finding plaintiff's refusal to follow a direct instruction a legitimate nondiscriminatory reason for plaintiff's termination); *Ponniah Das v. Our Lady of Mercy Med. Ctr.*, No. 00 Civ. 2574, 2002 WL 826877, at *9 (S.D.N.Y. Apr. 30,

**C.    Feinerman Has Failed to Show that T-Mobile's Nondiscriminatory Reason for her Termination Was Pretextual**

Because T-Mobile stated a legitimate, nondiscriminatory reason for terminating Feinerman, she must show that T-Mobile's explanation is merely a pretext for discrimination. Feinerman makes two arguments in an attempt to show pretext.[162] *First*, Feinerman argues that committing to travel to conferences was not a requirement of the Regional Director position but rather a requirement imposed only on Feinerman based on T-Mobile's "discriminatory perception" that Feinerman would not attend out-of-town meetings "as a result of her maternal obligations."[163] The fact that Feinerman was the only Regional Director required to affirmatively commit to attending the conferences does not show that T-Mobile terminated Feinerman for a discriminatory reason. T-Mobile asked Feinerman to

---

2002) ("Unwillingness to follow a supervisor's orders is a legitimate nondiscriminatory reason for terminating an employee's employment.").

[162]    *See* Opp. Mem. at 26. Feinerman also argues that "the fact that T-Mobile offered Ms. Feinerman a severance package offering to pay her money for a release of claims rebuts the presumption that she was terminated for 'cause.'" *See id.* at 26-27. However, nothing in the record suggests that any portion of Feinerman's severance package was conditioned on Feinerman releasing any claims she may have against T-Mobile. Even if Feinerman was asked to release any claims she had against T-Mobile, this does not show that T-Mobile terminated Feinerman for a discriminatory reason or that Feinerman's claims against T-Mobile are meritorious.

[163]    *Id.* at 26.

commit to attending future conferences because she had missed at least portions of conferences and she was the only Regional Director who expressed any unwillingness to travel. Feinerman's poor attendance record and her repeated requests to miss additional conferences belies any assertion that T-Mobile required Feinerman to commit to attending future conferences based on a discriminatory *assumption* that Feinerman would fail to attend conferences because of her child care obligations.

*Second*, Feinerman argues that she would have been terminated regardless of whether she committed to attending future conferences.[164] In support of this argument Feinerman points to the fact that Lampkin, in conjunction with T-Mobile's Human Resources Department, prepared a severance package for Feinerman even though Lampkin represented to Feinerman that T-Mobile wanted her to stay in her position.[165] T-Mobile's preparation for the possibility that Feinerman might be terminated does not indicate that T-Mobile intended to terminate Feinerman even if she committed to attending future conferences. Furthermore, even assuming that T-Mobile did intend to terminate Feinerman regardless of whether she committed to attending future conferences, this does not

---

[164]   *See id.*

[165]   *See id.*

show either that the reason for Feinerman's termination was something other than her poor attendance record at conferences or that discrimination played a role in T-Mobile's decision to terminate Feinerman.

In light of Feinerman's minimal evidence of discrimination and her repeated refusals to either attend, or even agree to attend, required conferences in their entirety, no reasonable jury could conclude that T-Mobile's stated reason for terminating Feinerman is pretextual. Accordingly, T-Mobile is entitled to summary judgment on Feinerman's gender discrimination claim.

## D. Feinerman Has Failed to State a Prima Facie Case for Discriminatory Retaliation

Feinerman claims that she was terminated from T-Mobile in retaliation for her request to be given an accommodation that would eliminate or reduce her travel requirements. Title VII only prohibits retaliating against an employee's opposition to an employer's activities that are prohibited under Title VII or an employee's involvement in an investigation, proceeding, or hearing relating to claims brought under Title VII.[166] "'[O]pposition' includes activities such as making complaints to management, writing critical letters to customers,

_____

[166]    *See* 42 U.S.C. § 2000e-3(a); *Accord Cruz*, 202 F.3d at 566 ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination.").

protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges."[167]  A request to be excused from attending conferences cannot be construed as opposition to an employer's prohibited activities and therefore does not constitute a protected activity under Title VII.  Because Feinerman cannot show a prima facie case for discriminatory retaliation, T-Mobile's motion for summary judgement is granted with respect to this claim.

### E.  Feinerman's Claims Against Lampkin in His Individual Capacity

T-Mobile alleges, and Feinerman does not dispute, that Lampkin has never been served with the Summons or Complaint, nor has he appeared in this action.[168]  I need not address whether the claims against Lampkin should be dismissed "without prejudice" pursuant to Federal Rule of Civil Procedure 4(m)[169]

---

[167]  *Cruz*, 202 F.3d at 566.

[168]  *See* Def. Mem. at 1 n.1.

[169]  Rule 4(m) states:

If a defendant is not served within 120 days after the complaint is filed, the court — on motion or on its own after notice to the plaintiff — must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

because Feinerman's Title VII claims must be dismissed with prejudice on the ground that Title VII does not provide for individual liability.[170] Additionally, Feinerman's claims against Lampkin under the NYSHRL and NYCHRL are dismissed on the merits, with prejudice, for the reasons stated above.

## V. CONCLUSION

For the foregoing reasons, T-Mobile's motion for summary judgement is granted and Feinerman's claims against Lampkin in his individual capacity are dismissed with prejudice. The Clerk of the Court is directed to close this motion (Docket No. 13) and this case (08 Civ. 03517).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           January 28, 2010

---

[170]    *See, e.g.*, *Sassaman*, 566 F.3d at 315 (affirming the district court's dismissal of plaintiff's Title VII claims against an individual defendant because "individuals are not subject to liability under Title VII" (quotation marks omitted)); *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 56, 59 (2d Cir. 2004) (affirming the district court's dismissal of plaintiff's Title VII claims against her manager on the ground that "there is no individual liability under Title VII"); *Gregory*, 243 F.3d at 689 n.1 (stating that an individual supervisor is not a proper defendant under Title VII).

## - Appearances -

**For Plaintiff:**

Jonathan S. Sack, Esq.
Sack & Sack
110 E. 59th Street, 19th Floor
New York, New York 10022
(212) 702-9000

**For Defendant:**

Hallie B. Levin, Esq.
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway
New York, New York 10019
(212) 833-1100